UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ATLANTIC SPECIALTY INSURANCE COMPANY, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 1:19-cv-03589-JRS-MJD |
| ANTHEM, INC., f/k/a WELLPOINT, INC., | ) ) | |
| Defendant. | ) | |

**ORDER ON MOTIONS RELATING TO ARBITRATION**

This matter is before the Court on Plaintiffs' Motion to Stay Arbitration [Dkt. 24] and

Defendant's Motion for a Stay and to Compel Arbitration [Dkt. 42].  For the reasons set forth

below, the Court **GRANTS IN PART** Plaintiffs' motion and **DENIES** Defendant's motion.

**I.  BACKGROUND**

Defendant Anthem, Inc., ("Anthem") is a defendant in a series of antitrust class action

suits that have been consolidated into a multi-district litigation action pending in the Northern

District of Alabama ("the MDL").  Anthem has sought coverage for the MDL from its Errors and

Omissions ("E&O") insurers, which include Plaintiffs Atlantic Specialty Insurance Company

("Atlantic") and Bedivere Insurance Company ("OneBeacon").  Atlantic and OneBeacon have

denied coverage.

The Atlantic and OneBeacon policies are part of a "tower" of $175 million in E&O insurance purchased by Anthem for the period of January 31, 2012, to January 31, 2013. The primary policy in the tower was issued by ACE American Insurance Company (the "ACE Primary Policy"). The Atlantic Policy is an excess policy that sits right above the ACE Primary Policy in the tower. The OneBeacon Policy is an excess policy that sits at the top of the tower.

On April 19, 2019, at the request of Anthem, the parties, along with other insurers in the tower, participated in a mediation proceeding in an attempt to resolve their coverage dispute. By agreement, the mediation was conducted in Bermuda by Layn Philips of Phillips ADR, a retired federal judge who also has conducted multiple mediation sessions between the parties in the MDL. The mediation (hereinafter referred to as the "Philips Mediation") was unsuccessful.

On August 7, 2019, Anthem initiated arbitration proceedings in Indianapolis against Atlantic and OneBeacon pursuant to the Alternative Dispute Resolution provision in the ACE Primary Policy (hereinafter referred to as the "ADR Provision"). In response, Plaintiffs filed this declaratory judgment action, in which they seek declaratory judgment that Anthem is not entitled to coverage for the MDL under either the Atlantic Policy or the OneBeacon Policy for various reasons and that the April 19, 2019, mediation satisfied the ADR Provision.

In the instant motions, Plaintiffs seek to stay arbitration indefinitely, arguing that the proper forum to resolve the parties' coverage dispute is this court, not arbitration, while Anthem seeks to stay this case and compel arbitration pursuant to the ADR Provision.

## II.  APPLICABLE LAW

Pursuant to the Federal Arbitration Act ("FAA"), "arbitration should be compelled if three elements are present: (1) an enforceable written agreement to arbitrate, (2) a dispute within the scope of the arbitration agreement, and (3) a refusal to arbitrate." *Scheurer v. Fromm Family*

*Foods LLC*, 863 F.3d 748, 752 (7th Cir. 2017) (citations omitted).  The party seeking to compel arbitration has the burden of proof regarding these elements.  *A.D. v. Credit One Bank, N.A.*, 885 F.3d 1054, 1063 (7th Cir. 2018); *see also Wilson Fertilizer & Grain, Inc. v. ADM Mill. Co.*, 654 N.E.2d 848, 849 (Ind. Ct. App. 1995) ("A party seeking to compel arbitration must satisfy a two-prong burden of proof.  First, the party must demonstrate an enforceable agreement to arbitrate the dispute.").

"Generally, federal policy favors arbitration, and once an enforceable arbitration contract is shown to exist, questions as to the scope of arbitrable issues should be resolved in favor of arbitration."  *Scheurer*, 863 F.3d at 752 (citing *Moses H. Cone Mem. Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24-25 (1983)).  "At bottom, however, arbitration is contractual.  A party 'cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *Id.* (quoting *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960) (additional citations omitted)).  As the Supreme Court has stated on "numerous occasions," "the central or 'primary' purpose of the FAA is to ensure that 'private agreements to arbitrate are enforced according to their terms.'"  *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682 (2010) (citations omitted).  To that end, "the FAA imposes certain rules of fundamental importance, including the basic precept that arbitration 'is a matter of consent, not coercion.'"  *Id.* at 681 (quoting *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.,* 489 U.S. 468, 479 (1989)).

### III.  DISCUSSION

Before addressing the merits of the parties' arguments, the Court must determine the standard that applies to the instant motions.  Both motions raise the fundamental issue of whether

arbitration should be compelled.  The Court's power to compel arbitration is set forth in the FAA

as follows:

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement.  Five days' notice in writing of such application shall be served upon the party in default.  Service thereof shall be made in the manner provided by the Federal Rules of Civil Procedure.  **The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement.**  The hearing and proceedings, under such agreement, shall be within the district in which the petition for an order directing such arbitration is filed.  **If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof.**  If no jury trial be demanded by the party alleged to be in default, or if the matter in dispute is within admiralty jurisdiction, the court shall hear and determine such issue.  Where such an issue is raised, the party alleged to be in default may, except in cases of admiralty, on or before the return day of the notice of application, demand a jury trial of such issue, and upon such demand the court shall make an order referring the issue or issues to a jury in the manner provided by the Federal Rules of Civil Procedure, or may specially call a jury for that purpose.  If the jury find that no agreement in writing for arbitration was made or that there is no default in proceeding thereunder, the proceeding shall be dismissed.  If the jury find that an agreement for arbitration was made in writing and that there is a default in proceeding thereunder, the court shall make an order summarily directing the parties to proceed with the arbitration in accordance with the terms thereof.

9 U.S.C.A. § 4 (emphasis added).

It is clear, then, that the Court must be "satisfied that the making of the agreement for

arbitration or the failure to comply therewith is not in issue" in order to compel arbitration

without a trial.  Plaintiffs do not articulate the standard by which they believe the Court should

make that determination.  Anthem states, in a footnote, that "[w]hile the FAA does not

specifically identify the evidentiary standard required of a party opposing a motion to compel

4

arbitration, courts have analogized this burden to one of a party opposing summary judgment."

[Dkt. 43 at 10 n.4] (citing *Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735 (7th Cir. 2002)). *Tinder*

does, indeed, hold that the party opposing a motion to compel arbitration "must demonstrate that

a genuine issue of material fact warranting a trial exists." 305 F.3d at 735 (citing *Doctor's*

*Associates, Inc. v. Distajo,* 107 F.3d 126, 129-30 (2d Cir. 1997); *Great Western Mortgage Corp.*

*v. Peacock,* 110 F.3d 222, 231 n. 36 (3d Cir. 1997); *Dillard v. Merrill Lynch, Pierce, Fenner &*

*Smith, Inc.,* 961 F.2d 1148, 1154 (5th Cir. 1992)). This, however, must be read in conjunction

with the fact that, as noted above, the party seeking to compel arbitration has the burden of

proving that an agreement to arbitrate the dispute exists. *A.D.*, 885 F.3d at 1063. Thus, the

question before the Court in this case is whether, based on the record before it, it can resolve the

issue of the existence of an arbitration agreement as a matter of law, or whether there are

questions of fact that must be resolved in order to make that determination. If the latter, the issue

must proceed to trial as set forth in 9 U.S.C. § 4.

**A. Is Anthem Entitled to Demand Arbitration Pursuant to the ADR Provision?**

Anthem argues that both Atlantic and OneBeacon are subject to the ADR Provision,[1]

which reads as follows:

1. In the event that any disputes or differences arise under or in connection with this Policy or the breach, termination or invalidity thereof, whether arising before or after termination of this Policy, the **Insured** and **Insurer** shall make a good faith attempt to resolve the disputes or differences through informal negotiations.

2. If such disputes or differences remain unresolved, the **Insured** and **Insurer** shall submit such disputes or differences to an alternative dispute resolution

---

[1] The parties agree that the ADR Provision is incorporated into the Atlantic Policy. As discussed in Part C below, they disagree whether it applies to the OneBeacon Policy.

("ADR") process as described in paragraph 3 below.  Either the **Insured** or the **Insurer** may select the type of ADR process; provided, however, the **Insured** shall have the right to reject the **Insurer's** choice of the type of ADR process at any time prior to its commencement, in which case the **Insured's** choice of ADR process shall control. Commencement of the ADR process shall occur when the parties formally retain a mediator or arbitrator to preside over the ADR proceeding.

3.  The **Insured** and **Insurer** agree that there shall be two choices of ADR process:

   a.  Non-binding mediation administered by JAMS.  The **Insured** and **Insurer** shall cooperate with one another in selecting a mediator from the JAMS panel of neutrals and in scheduling the mediation proceedings.  The parties agree that they will participate in the mediation in good faith and share equally in its costs.  The mediation will take place in New York, New York.  In the event of mediation, either party shall have the right to commence a judicial proceeding; provided however, no such judicial proceeding shall be commenced until the mediation has been concluded or terminated and at least ninety (90) days shall have elapsed from the date of the conclusion or termination of the mediation.

   b.  Binding arbitration through JAMS before three arbitrators, with each arbitrator having background and experience relevant to the dispute.  Each party shall select one arbitrator, and the two arbitrators shall select the third arbitrator.  The arbitration shall be conducted pursuant to the then-current JAMS Comprehensive Arbitration Rules & Procedures.  The decision of the arbitrator shall be final, binding and provided to both parties; provided, however, the arbitrator's decision shall be subject to appeal pursuant to Rule 34, Optional Arbitration Procedure, of the JAMS Comprehensive Arbitration Rules & Procedures.

      i.  Unless the parties otherwise agree, the arbitration shall take place in Indianapolis, Indiana, Chicago, Illinois or New York, New York, to be determined by the mutual agreement of the parties.  If the parties cannot agree, then the arbitrators shall choose from one of these three venues.

      ii.  Each party shall bear the expense of its own arbitrator and shall jointly and equally bear with the other party the cost of the third arbitrator.  The panel will allocate any remaining common expenses of the arbitration.

iii. If an arbitration proceeding has not been commenced within ninety (90) days of the appointment of the arbitrator, the arbitrator may order the commencement of such proceeding at anytime thereafter. It is the intention of the parties that discovery, argument and other process in the arbitration shall be limited to that which, in the discretion of the arbitrator, is necessary to fairly resolve the dispute.

[Dkt. 42-3 at 22-23.]

The parties dispute whether, pursuant to the ADR Provision, the fact that the parties participated in the Phillips Mediation means that Anthem may not now compel Plaintiffs to engage in binding arbitration. "When deciding whether the parties agreed to arbitrate a certain matter, courts generally should apply ordinary state-law principles that govern the formation of contracts." *Druco Restaurants, Inc. v. Steak N Shake Enterprises, Inc.*, 765 F.3d 776, 781 (7th Cir. 2014) (citing *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944 (1995); *MPACT Constr. Group, LLC v. Superior Concrete Constructors, Inc.,* 802 N.E.2d 901, 904 (Ind. 2004)) (additional citations omitted). Anthem asserts, and Defendants do not dispute, that Indiana law applies to the issues before the Court.

> Under Indiana law, "[w]hether the parties agreed to arbitrate any disputes is a matter of contract interpretation, and most importantly, a matter of the parties' intent." *MPACT,* 802 N.E.2d at 906; *Wolvos v. Meyer,* 668 N.E.2d 671, 675 n. 1 (Ind. 1996) (when interpreting written contracts, courts seek to ascertain the intent of the parties at the time the contract was made as disclosed by the contract language); *Brockmann v. Brockmann,* 938 N.E.2d 831, 835 (Ind. App. 2010) (the court's ultimate goal is to determine the parties' intent in drafting the contract, and to effectuate that intent).

*Druco Restaurants, Inc.*, 765 F.3d at 782. "Unless the terms of a contract are ambiguous, they will be given their plain and ordinary meaning." *Id.* (citing *Brockmann,* 938 N.E.2d at 834).

Anthem's argument that it is entitled to compel arbitration is two-fold. First, Anthem argues that the ADR Provision does not preclude it from first electing mediation and then, if

7

mediation is unsuccessful, electing binding arbitration. That argument is without merit.[2] The plain language of the ADR Provision states that the parties "shall submit [their] disputes or differences to **an** alternative dispute resolution ("ADR") process as described in paragraph 3 below." It permits Anthem to choose which of the two options will be used, but it unambiguously obligates the parties to participate in only one of them. Thus, if Anthem elected mediation as its ADR method of choice, it cannot also compel Plaintiffs to submit to binding arbitration.

There is, of course, no question that the parties participated in mediation. However, Anthem argues that the Phillips Mediation did not satisfy the requirement in the ACE Primary Policy that the parties submit their coverage dispute to an ADR process because it did not take place in New York before a JAMS mediator. Plaintiffs argue that by requesting that the parties participate in mediation before Judge Philips in Bermuda, Anthem exercised its right under the ADR Provision to choose non-binding mediation as the method of ADR to be used and waived its right to require strict compliance with the ADR Provision with regard to the location of the mediation and the identity of the mediator.

There is no dispute that Anthem initiated the mediation between it and its insurers with Judge Phillips. Its request was memorialized in a December 17, 2018, email between counsel for Anthem and counsel for Ace (its primary insured) that read:

> To follow-up on our discussion on Thursday afternoon, this will confirm that Anthem is interested in having discussions with its carriers regarding coverage for the BCBS Antitrust MDL in order to determine whether a settlement/amicable

---

[2] Anthem argues that Plaintiffs conceded this argument by not responding to it. The Court disagrees. Plaintiffs clearly argued in their opening brief that the ADR Provision "gives *no arbitration authority*" if the mediation provision is selected. [Dkt. 25 at 11.] Plaintiffs were not required to rebut Anthem's rebuttal to their argument in order to preserve their argument.

resolution of coverage matters can be reached. Specifically, Anthem proposes that Anthem, Ace and its excess carriers have insurance coverage mediation settlement discussions with Judge Phillips, as a continuation of the prior mediation sessions with him. We understand that Judge Phillips is available March 25 to do so.

Please confirm that Ace is on board with that process and let us know whether the March 25 date would work for you and your client.

[Dkt. 25-4 at 2.] Anthem has submitted the declaration of the author of that email, David Goodsir, that states:

5. In or around early 2016, the defendant Blue Plans, including Anthem, and the insurance carriers of defendant Blue Plans, including plaintiffs, agreed that Judge Phillips could mediate insurance matters in connection with the mediation of the underlying Antitrust Litigation. Separate mediation caucuses took place with Judge Phillips on February 17, 2016 (with coverage counsel for the Blue Plans) and, upon information and belief, February 19, 2016 (with the carriers for defendant Blue Plans). Additionally, insurance mediation sessions with the defendant Blue Plans, including Anthem, and their carriers, including plaintiffs, were held on May 23, 2016, and September 12-13, 2016 with Judge Phillips of Phillips ADR.

6. As a continuation of the insurance mediation discussions in 2016 with Judge Phillips, Anthem and its E&O insurers agreed to engage in a further mediation session and mediation settlement discussions on April 19, 2019 in Bermuda.

7.	I, along with my partner Dan Hofmeister of Reed Smith LLP, attended that mediation session, which took place in Bermuda, with an Anthem client representative and Anthem's 2012-13 E&O insurers, including a client representative of plaintiffs and their outside counsel.

8.	The mediation sessions with Judge Phillips were administered by Phillips ADR and Judge Phillips is affiliated with Phillips ADR.

9.	Anthem has made no election of mediation under the ADR clause in the Anthem primary policy issued by ACE American Insurance Company ("ACE Primary Policy") or any Anthem excess insurance policy. Anthem has not elected, or taken the position, that it was electing mediation and then thereafter to be followed by litigation under the ADR provision in the ACE Primary Policy or any Anthem excess insurance policy. Nor did Anthem have any agreement with any insurer that the coverage mediation with Judge Phillips of Phillips ADR in Bermuda in April 2019 was an election of mediation under the ADR clause in the primary policy or any other policy.

[Dkt. 42-2 at 3-4.]

Under Indiana law,

> [w]aiver is an intentional relinquishment of a known right involving both knowledge of the existence of the right and the intention to relinquish it." *van de Leuv v. Methodist Hosp. of Ind., Inc.,* 642 N.E.2d 531, 533 (Ind. Ct. App. 1994). A condition in a contract may be waived by the conduct of a party. *Salcedo v. Toepp,* 696 N.E.2d 426, 435 (Ind. Ct. App. 1998); *see also FOP Lodge No. 52 v. Civil City of Elkhart,* 551 N.E.2d 469, 471 (Ind. Ct. App. 1990) *trans. denied* (noting that strict performance of the terms of a contract on the part of one party may be waived by the other). "Once a condition has been waived, and such waiver has been acted upon, the failure to perform the condition cannot be asserted as a breach of contract." *Salcedo,* 696 N.E.2d at 435.

*Int'l Health & Racquet Club, Inc. v. Scott*, 789 N.E.2d 62, 66 (Ind. Ct. App. 2003). In addition, under Indiana law "[i]t is certainly the case that parties may mutually modify contractual

undertakings.  Even a contract providing that any modification thereof must be in writing, nevertheless may be modified orally."  *Sees v. Bank One, Indiana, N.A.*, 839 N.E.2d 154, 161 (Ind. 2005) (citations omitted).  Further, the "'modification of a contract can be implied from the conduct of the parties.'"  *Gerdon Auto Sales, Inc. v. John Jones Chrysler Dodge Jeep Ram*, 98 N.E.3d 73, 80 (Ind. Ct. App.), *transfer denied sub nom. Gerdon Auto Sales, Inc. v. Jones*, 102 N.E.3d 890 (Ind. 2018) (quoting *Gilliana v. Paniaguas*, 708 N.E.2d 895, 897 (Ind. Ct. App. 1999)).  "As a general rule, '[q]uestions regarding the modification of a contract are ones of fact[.]'"  *Id.* (quoting *Skweres v. Diamond Craft Co.*, 512 N.E.2d 217, 221 (Ind. Ct. App. 1987)).

> Since there was no written or other explicit agreement to modify the Contract, we must rely on the designated evidence to determine whether, as a matter of law, the conduct of the parties supports more than one inference of their intent.  The intent relevant in contract matters is not the parties' subjective intents but their outward manifestation of it.  *See Zimmerman v. McColley*, 826 N.E.2d 71, 77 (Ind. Ct. App. 2005).  In order to determine a party's intent, a court does not examine the hidden intentions secreted in the heart of a person but should examine the final expression of that intent found in conduct.  *See id.*

*Id.*

Here, there is a question of fact whether Anthem, by its conduct, waived the specific requirements of the ADR Provision relating to mediation by proposing a modification of the contract that was accepted, and acted upon, by Defendants.[3]  Anthem argues that the unequivocal

---

[3] Not surprisingly, Anthem emphasizes the federal policy of favoring arbitration in its briefs and argues that, given this policy, "[a]ny doubts regarding the scope of arbitrable issues, including questions of waiver, are resolved in favor of arbitration."  *See, e.g.*, [Dkt. 47 at 11] (citing *Welty Bldg. Co., Ltd. v. Indy Fedreau Co., LLC*, 985 N.E.2d 792, 799 (Ind. Ct. App. 2013)).  However, the Court notes that "[b]oth federal and state courts acknowledge that the FAA's policy in favor of arbitration applies when determining the *scope* of an agreement to arbitrate, but not when deciding whether there is an agreement to arbitrate in the first instance."  *Druco Restaurants, Inc.*, 765 F.3d at 781-82 (emphasis in original) (citing *MPACT Const. Group, LLC,* 802 N.E.2d at 906-07 (a court must determine under applicable state law whether the parties generally agreed to arbitrate disputes, without being influenced by the federal policy in favor of arbitration)

statement in the Goodsir affidavit that Anthem did not elect mediation under the ADR Provision proves the point, but that is simply a statement of Anthem's subjective intent. A reasonable factfinder could infer, based on the facts of record, that the parties, by their conduct, modified the ADR Provision to permit satisfaction of the mediation provision by mediation with Judge Phillips in Bermuda. If so, Plaintiffs, by their participation in that mediation, accepted that modification, giving up their right to insist that any mediation take place in New York before a JAMS mediator and Anthem, having received the mediation that it requested, could not now insist that only a mediation that strictly complied with the ADR Provision in all respects could satisfy the ADR Provision.[4] However, a reasonable factfinder also could infer the opposite and find that the circumstances under which Anthem suggested that the parties mediate with Judge Phillips do not manifest the parties' intention to treat the Phillips Mediation as satisfying the ADR Provision. Therefore, the Court may not decide the issue as a matter of law.

_____

(additional citations omitted). Here, the question is not whether Anthem has waived its right to arbitration pursuant to an agreement to arbitrate, but whether Anthem waived its right to require strict compliance with another part of the contract—the mediation provision—in which event there would be no agreement to arbitrate.

[4] Anthem argues that if Plaintiffs wanted the Phillips mediation to satisfy the ADR Provision, they could have made that clear "prior to or around the time of the mediation," and that one could infer from the fact that they waited until after Anthem filed for arbitration that they "did not raise the issue for a good reason: they did not actually believe that the mediation satisfied the Mediation Option of the ACE ADR provision," or that they "made a deliberate, tactical decision not to raise the ADR issue because they thought it was not in their interests to clarify it." [Dkt. 43 at 21.] But the converse is equally true. If Anthem wished for the mediation with Judge Phillips to be treated as "informal negotiations" rather than mediation that satisfied the ADR Provision, its lawyers easily could have expressed that to the Plaintiffs, who then could have decided whether they were willing to engage in the mediation under those circumstances, knowing that the parties would be required to engage in an additional ADR proceeding if the mediation was unsuccessful. There is no evidence that Anthem communicated that to Plaintiffs at the relevant time.

## B. Who Decides Arbitrability?

Anthem argues that the issue of whether it is entitled to invoke the arbitration clause under the contract is a question of arbitrability that the parties have agreed to arbitrate. "Whether the parties have agreed to arbitrate is a question normally answered by the court rather than by an arbitrator. The issue is governed by state law principles governing contract formation." *Cont'l Cas. Co. v. Am. Nat. Ins. Co.*, 417 F.3d 727, 730 (7th Cir. 2005). Anthem is correct that there is an exception to this general rule when the parties "clearly and unmistakably" agree to submit questions of arbitrability to arbitration. *See Herrington v. Waterstone Mortg. Corp.*, 907 F.3d 502, 507 n.3 (7th Cir. 2018) (citing *Int'l Med. Grp., Inc. v. Am. Arb. Ass'n*, 312 F.3d 833, 842 (7th Cir. 2002)). Anthem argues that the parties have done so here by incorporating the JAMS rules in their arbitration clause, and the Court will assume that is correct for purposes of this ruling. [*See* Dkt. 43 at 13-14 (recognizing that Seventh Circuit has not decided this issue and citing relevant cases from other courts).] Here, however, the incorporation of the JAMS rules is applicable only if Anthem had the right under the contract to invoke the arbitration clause in the first place. As discussed above, under the unambiguous language of the contract, the arbitration clause is of no effect if Anthem elects mediation instead of arbitration; in other words, the parties agreed to arbitrate—and therefore incorporated the JAMS rules into their contract—only in the event that Anthem did not elect mediation as the means of alternative dispute resolution. While the presumption that the court decides questions of arbitrability "may be overcome where the parties 'clearly and unmistakably' agree to arbitrate threshold questions such as whether the arbitration clause applies to a particular dispute, or whether it is enforceable, parties may not delegate to the arbitrator the fundamental question of whether they formed the agreement to arbitrate in the first place." *Doctor's Assocs., Inc. v. Alemayehu*, 934 F.3d 245,

250-51 (2d Cir. 2019) (citing *Granite Rock Co. v. International Brotherhood of Teamsters,* 561 U.S. 287, 299-301 (2010)).  Thus, the issue of whether the Phillips mediation satisfied the ADR Provision must be decided in this court; if it did, there is no agreement to arbitrate, and therefore nothing to be arbitrated.

## C. OneBeacon

The OneBeacon Policy is a "follow form" excess policy.

> Following form "is an insurance industry term of art that is typically understood by insurance professionals to suggest that an excess or umbrella policy incorporates the terms of another underlying policy." *Wadzinski v. Auto-Owners Ins. Co.*, 342 Wis.2d 311, 818 N.W.2d 819, 829 (2012) (citation omitted).  As such, absent explicit limitations to the contrary, a follow form provision incorporates the terms, definitions, exclusions, and conditions of the underlying policy "to ensure that the same terms of coverage are maintained between primary and excess levels of insurance." *Id.*

*Wisconsin Local Gov't Prop. Ins. Fund v. Lexington Ins. Co.*, 840 F.3d 411, 415 (7th Cir. 2016) (citing Wisconsin law); *see also WellPoint, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 29 N.E.3d 716, 718 (Ind.), *opinion modified on reh'g,* 38 N.E.3d 981 (Ind. 2015) (recognizing that "follow form" policies "incorporate all the terms and conditions of the primary policy"); *Safety Nat. Cas. Co. v. Cinergy Corp.*, 829 N.E.2d 986, 998 (Ind. Ct. App. 2005) ("Safety Mutual's policies 'follow form' to underlying policies, which means that they incorporate the terms of the policies with lower coverage limits for the same policy period.").  "As such, absent explicit limitations to the contrary, a follow form provision incorporates the terms, definitions, exclusions, and conditions of the underlying policy 'to ensure that the same terms of coverage are maintained between primary and excess levels of insurance.'"  *Id.*

The OneBeacon Policy expressly provides that it "will apply in conformance with, and will follow the form of, the terms, conditions, agreements, exclusions, definitions and

endorsements of the Underlying Insurance, except . . . with respect to any provisions to the contrary contained in this Policy."  Dkt. 25-3 at 9.  The "Underlying Insurance" is expressly defined in the OneBeacon Policy as follows:

| Carrier | Policy# | Limit | Coverage |
|---|---|---|---|
| ACE American Insurance Company | MSP G21816097 006 | $20,000,000 | Managed Care Organization Errors & Omissions Liability |
| Lloyd's Syndicate AGM 2488 | B0080119735P12 | $20,000,000 Excess of $20,000,000 | Managed Care Organization Errors & Omissions Liability Excess |
| BCS Insurance Company | XS-MCE 121-40 | $20,000,000 Excess of $40,000,000 | Managed Care Organization Errors & Omissions Liability Excess |
| XL Insurance (Bermuda) Ltd. | BM00026068EO12A | $20,000,000 Excess of $60,000,000 | Managed Care Organization Errors & Omissions Liability Excess |
| Chartis Excess Limited | 28330206 | $20,000,000 Excess of $80,000,000 | Managed Care Organization Errors & Omissions Liability Excess |
| Endurance Specialty Insurance, Ltd. | P011413002 | $10,000,000 part of $25,000,000 Excess of $100,000,000 | Managed Care Organization Errors & Omissions Liability Excess |
| Iron-Starr Excess Agency Ltd. | ISF0000810 | $13,500,000 part of $25,000,000 Excess of $100,000,000 | Managed Care Organization Errors & Omissions Liability Excess |
| Argo Re Ltd. | ARGO-EANDO-12-000218.3 | $13,500,000 part of $15,000,000 Excess of $125,000,000 | Managed Care Organization Errors & Omissions Liability Excess |
| Ironshore Specialty Insurance Company | 000926402 | $18,000,000 part of $20,000,000 Excess of $140,000,000 | Managed Care Organization Errors & Omissions Liability Excess |
| BCS Insurance Company | XS MCS 121-040B | $9,000,000 part of $10,000,000 Excess of $160,000,000 | Managed Care Organization Errors & Omissions Liability Excess |

*Id.* at 6.

The OneBeacon Policy itself is silent with regard to arbitration.  The underlying policies differ with regard to arbitration.  The two BCS Insurance Company Policies and the Ironshore Specialty Insurance Company Policy each follows form to the ACE Primary Policy and is otherwise silent as to arbitration.  [Dkt. 42-3 at 46, 68, and 77].  The Iron-Starr Excess Agency Ltd. Policy and the Lloyd's Syndicate AGM Policy each expressly incorporates the dispute resolution procedures of the ACE Primary Policy.  [Dkt. 42-3 at 96, 186.]   The remaining

policies followed by the OneBeacon policy each has an arbitration provision; those provisions differ from one another as set forth in the following table:

| | ACE Primary Policy[5] | XL Insurance (Bermuda) Ltd. Policy and Argo Re Ltd. Policy[6] | Chartis Excess Limited Policy[7] | Endurance Specialty Insurance, Ltd. Policy[8] |
|---|---|---|---|---|
| Type | Binding arbitration if elected by Insured | Binding arbitration | Binding arbitration or ADR | Binding arbitration |
| Location | Indianapolis, Chicago, or New York; agreed by parties or selected by arbitrators | London, England, Hamilton, Bermuda, or Toronto, Canada | London, England, or Hamilton, Bermuda; chosen by the insured | Bermuda |
| Applicable Rules | JAMS Comprehensive Arbitration Rules & Procedures | JAMS International Arbitration Rules in effect August 1, 2011, with specific modifications set forth in the policies | The Bermuda International Conciliation and Arbitration Act of 1993 (if in Hamilton, Bermuda) or the English Arbitration Act of 1996 (if in London) | The Bermuda International Conciliation and Arbitration Act 1993 |
| Costs | "Each party shall bear the expense of its own arbitrator and shall jointly and equally bear with the other party the cost of the third arbitrator. The panel will allocate any remaining common expenses of the arbitration." | "Costs of the arbitration shall be in the sole discretion of the [three arbitrators], who may direct to whom and by whom and in what manner they shall be paid." | "Each party shall bear the costs of its own arbitrator. The remaining costs of the arbitration shall be borne equally by the parties." | "Each party shall bear the costs of its own arbitrator and all costs of the third arbitrator and of the arbitration shall be borne equally by the parties." |

[5] [Dkt. 42-3 at 22-23.]
[6] [Dkt. 42-3 at 134-35, 206-07.]
[7] [Dkt. 42-3 at 140-41.]
[8] [Dkt. 42-3 at 159.]

The OneBeacon Policy thus has "followed" numerous provisions relating to arbitration, and those provisions are impossible to reconcile with one another.

Anthem argues that this quagmire[9] should be resolved by looking only to the ADR Provision because the ACE Primary Policy is the primary policy in the tower. The problem with this argument is that it ignores the plain language of the OneBeacon Policy which, unlike the other policies in the Tower, expressly follows form to **all** of the other underlying policies, not just the ACE Primary Policy. Anthem also argues that the fact that **all** of the Underlying Policies provide for arbitration in some form means that OneBeacon clearly agreed to arbitration and can be compelled to arbitrate. But that, of course, begs the question of what type of arbitration OneBeacon can be compelled to undertake. Anthem argues, on the one hand, that the place of and rules under which non-binding mediation took place were material to the ADR Provision in the ACE Primary Policy, but implicitly suggests that the place of and rules under which binding arbitration takes place is not material to the various policies followed by the OneBeacon Policy.

Finally, Anthem argues that OneBeacon, by arguing that the conflicting arbitration provisions mean that there is no enforceable arbitration provision at all, "essentially is relying entirely on a self-imposed ambiguity in its own policy." [Dkt. 43 at 16-17.] The Court agrees that the OneBeacon policy is ambiguous with regard to arbitration. The question is how this ambiguity should be resolved under Indiana law.

---

[9] The Court notes that there is a circuit split with regard to an analogous issue. *Cf. Matter of Willis*, 944 F.3d 577 (5th Cir. 2019), *with Ragab v. Howard*, 841 F.3d 1134 (10th Cir. 2016) (reaching opposite conclusions—both with a dissent—in cases in which the parties had executed more than one contract with conflicting arbitration provisions).

Under Indiana law, insurance contracts are governed by the same rules of construction as other contracts. *Bradshaw v. Chandler*, 916 N.E.2d 163, 166 (Ind. 2009).

> "The goal of contract interpretation is to determine the intent of the parties when they made the agreement." *Celadon Trucking Servs, Inc. v. Wilmoth*, 70 N.E.3d 833, 839 (Ind. Ct. App. 2017). This court must examine the plain language of the contract, read it in context and, whenever possible, construe it so as to render every word, phrase, and term meaningful, unambiguous, and harmonious with the whole. *Id.* Construction of the terms of a written contract generally is a pure question of law. *Id.* If, however, a contract is ambiguous, the parties may introduce extrinsic evidence of its meaning, and the interpretation becomes a question of fact. *Broadbent v. Fifth Third Bank*, 59 N.E.3d 305, 311 (Ind. Ct. App. 2016), *trans. denied.*

*Panther Brands, LLC v. Indy Racing League, LLC*, 126 N.E.3d 898, 904-05 (Ind. Ct. App. 2019), *trans. denied*; *see also Whitaker v. Brunner*, 814 N.E.2d 288, 293-94 (Ind. Ct. App. 2004) ("If . . . a contract is ambiguous, its meaning must be determined by examining extrinsic evidence and its construction is a matter for the fact finder."). Thus, in light of the ambiguity in the OneBeacon Policy, the Court finds that this issue cannot be decided as a matter of law, but rather is a factual issue that must be decided at trial. *Cf. Hopeman Bros., Inc. v. Cont'l Cas. Co.*, 307 F. Supp. 3d 433, 465-66 (E.D. Va. 2018) (finding policy ambiguous because it "follows form to conflicting underlying policies and does not specify which policy's terms should govern" and finding summary judgment precluded because "New York law establishes that where a provision of an insurance contract is ambiguous, the court must afford the parties the opportunity to adduce extrinsic evidence to determine the intent of the parties.").

Anthem argues that the Court should instead resolve the ambiguity by construing the policy "in the manner most favorable to the policyholder." [Dkt. 43 at 17] (citing J. MATHIAS, ET AL., INSURANCE COVERAGE DISPUTES §1.03[2][b] (2019); L. MASTERS, ET AL.,

INSURANCE COVERAGE LITIGATION § 13.07[B][1] (2d ed. 2009)).  However, Anthem
fails to point to any Indiana law on this point.

In fact, it does not appear that Indiana would follow the general rule of *contra
proferentem* in this context.  Generally, under Indiana law, "[w]here an ambiguity exists, that is,
where reasonably intelligent people may interpret the policy's language differently, we construe
insurance policies strictly against the insurer."  *Bradshaw*, 916 N.E.2d at 166 (citing *Fidelity and
Deposit Co. of Md. v. Pettis Dry Goods Co.,* 207 Ind. 38, 42, 190 N.E. 63, 65 (1934) ("any
doubts or ambiguities must be resolved most strongly against" the insurer)).  "Strict construction
against the insurer derives from the disparity in bargaining power characteristic of parties to
insurance contracts. . . .  'The insurance companies write the policies; we buy their forms or we
do not buy insurance.'" *Id.* (quoting *Wagner v. Yates*, 912 N.E.2d 805, 810 (Ind. 2009)).  The
basis for the rule does not appear to apply here, however, because both parties are sophisticated
insurance companies and there is no indication that Anthem simply had form insurance policies
thrust upon it.  *See Phillips v. Lincoln Nat. Life Ins. Co.*, 978 F.2d 302, 313-14 (7th Cir. 1992)
(general rule of *contra proferentem* not applicable if there is evidence that the parties negotiated
the terms of an insurance policy); 2 Couch on Ins. § 22:24 n.3 ("While insurance contracts are
usually offered to the insured on a take-it-or-leave-it basis and as such are termed contracts of
adhesion, justifying a construction against the insurer, such a rationale is inapplicable in many
circumstances, especially those involving . . . sophisticated parties who fully negotiated the
insurance contract . . . .") (collecting cases).

More fundamentally, in the usual situation, it is necessary to resolve an ambiguity in an
insurance policy in order to determine whether a particular loss will be covered by the policy.  In
those cases, there is no question which reading of the ambiguous provision favors the insured,

and that reading of the provision will favor the insured in every context, because it expands, rather than limits, the number of situations in which the insured will receive coverage. Resolving ambiguities in favor of the insured in such a case furthers the "general purpose of the insurance contract to provide coverage." *Bosecker v. Westfield Ins. Co.*, 724 N.E.2d 241, 244 (Ind. 2000). In this case, however, the ambiguity does not relate to whether Anthem's claim will be covered. In addition, whether resolving the ambiguity in favor of applying the ADR Provision favors the insured or the insurer depends solely on the preferences of the parties. It just so happens that the insured in this case wants to arbitrate and the insurer does not; the roles could just as easily be reversed. But the meaning of a contract cannot depend on the preference of a party at the time a dispute arises; the contract must have a meaning at the time it is executed. Because neither reading of the OneBeacon Policy objectively favored the insured at the time it was executed, it is not an appropriate application of *contra proferentem* to resolve the ambiguity by asking Anthem which reading it prefers under the current circumstances.

## IV. CONCLUSION

For the reasons set forth above, the Court finds that the issue of arbitrability cannot be resolved as a matter of law. The policies at issue are ambiguous, and the parties must be given the opportunity to present extrinsic evidence in order to resolve the ambiguity. Accordingly, Anthem's Motion for a Stay and to Compel Arbitration [Dkt. 42] is **DENIED** and Plaintiffs' Motion to Stay Arbitration [Dkt. 24] is **GRANTED**, but only to the extent that arbitration is **STAYED** pending final resolution of the issue of arbitrability by the Court. The parties shall confer regarding how this case should proceed, and particularly whether the trial on the issue

should be conducted by the Court or before a jury, and file a joint proposal **within 14 days of the date of this Order**.

SO ORDERED.

Dated:  31 JAN 2020

Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana

Distribution:

Service will be made electronically on all
ECF-registered counsel of record via email
generated by the Court's ECF system.